## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **UNITED FIRE & CASUALTY COMPANY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action No.: 5:23-cv-484** |
| **v.** | : | |
| | : | |
| **WILLIE J. BILLINGSLEA, JR., CORA BILLINGSLEA, AND BUDGET SERVICES & SUPPLIES, LLC,** | : | |
| | : | |
| **Defendants.** | : | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COMES NOW,** Willie J. Billingslea, Jr., Cora Billingslea, and Budget Services & Supplies, LLC, (collectively "Defendants"), by and through their attorneys of record, and pursuant to Rule 7.1 of the Local Rules for the Middle District of Georgia, and file this *Brief in Support of Motion for Summary Judgment.*

### I.    INTRODUCTION

This case involves an alleged breach of an indemnity agreement. In December 2019, Plaintiff entered a business relationship with a joint venture comprised of Budget Services & Supplies, LLC ("Budget Services") and ML Builders, LLC ("ML Builders"). Plaintiff agreed to provide surety bonds for construction jobs awarded to the joint venture; however, ML Builders expressed a desire to obtain its own bonds outside of the joint venture. As a result, Plaintiff drafted an indemnity agreement that would allow it to issue bonds to the joint venture and both contractors individually. This agreement was signed on January 21, 2020. Between July 2020 and January 2022, Plaintiff issued bonds exclusively to ML Builders, which eventually began to default on projects. No bonds were ever issued to Budget Services or the joint venture. Plaintiff, however, brought action against Defendants for indemnification of the "Bonded Projects" listed in the Complaint.

Plaintiff asserts five claims against Defendant that all require the existence of an enforceable contract: (1) Specific Performance of Collateral Demand, (2) Exoneration, (3) Judgment for

1

Indemnity, (4) Attorney's Fees, and (5) Interest. Plaintiff's claims are not viable because the undisputed facts show that the indemnity agreement is not an enforceable contract. The agreement does not constitute a valid contract; and in the event that this Court disagrees, the agreement would still be unenforceable under Georgia public policy. Consequently, Defendants are entitled to judgment as a matter of law.

## II.    STATEMENT OF FACTS – RELEVANT CONTRACT PROVISIONS

On January 21, 2020, Plaintiff and Defendants entered into an Agreement of Indemnity (hereinafter "the Agreement"). The Agreement was executed by Shawn and Jonathan McCullough on behalf of ML Builders, Willie Billingslea on behalf of Budget Services, and Shawn McCullough on behalf of the joint venture. The Agreement was also signed by Shawn McCullough, Jonathan McCullough, Willie Billingslea, and Cora Billingslea in their individual capacities. Cora Billingslea signed the Agreement at her husband's behest and was not significantly involved in the operation of Budget Services.[1]

The recitals of the Agreement, in part, state the following:

*NOW THEREFORE, in consideration of the premises, Indemnitors for themselves, their heirs, executors, administrators, successors, assigns, and their present and future Affiliates, jointly and severally, hereby covenant and agree with Surety, its successors and assigns, as follows:*

Paragraph One of the Agreement is titled "Recitals Incorporated". This paragraph states the following:

*Indemnitors agree that the above recitals are expressly incorporated herein, that they are material to this Agreement, and that Indemnitors' representations to Surety in the said recitals are intended to induce Surety to give, procure, provide, maintain, renew, modify, substitute or refrain from canceling Bonds, both concurrently and in the future. Indemnitors further agree that Surety's continuing reliance upon those representations is justified and reliable.*

Paragraph Two of the Agreement contains definitions for the words "Bond" and "Loss".

A "Bond" is defined as the following:

*Any surety bond, undertaking, recognizance, guarantee, writings or statements of prequalification or commitment, consent of surety or other obligation, including modifications or*

---

[1] Deposition of Cora Billingslea, 16:10 – 25; 23:12 – 26:16

renewals thereof, given, procured, provided, maintained, renewed, modified, or substituted by Surety in the name(s) or at the request of any indemnitor, solely or as co-venturer with others, whether before or after the date of this Agreement.

A "Loss" is defined as the following:

*Any and all payments, expenses or liability incurred or anticipated by Surety, including but not limited to attorney's fees, consultant fees, expert fees, and court costs, arising from or related to any Bond, any Claim, enforcing any of Surety's rights under this Agreement, and/or any and all unpaid premiums for any Bond.*

Paragraph Three of the Agreement is titled "Surety's Rights with Respect to The Execution, Declination, Modification, and Cancellation of Bonds". This paragraph states the following:

*Surety is authorized, at any time, with or without notice to or knowledge of indemnitors, to execute or refrain from executing any Bonds (including final Bond(s) where Surety has furnished a bid Bond), to assent, or refuse to assent, to any change whatsoever, in any Bonds of any Bonded Contract, to renew or refrain from renewing any Bonds, or to cancel or refrain from cancelling any Bonds, without impairing the obligations of indemnitors under this Agreement. Indemnitors hereby waive any and all defenses against Surety due to its refusal to its refusal or failure to execute any Bond or to modify, renew, continue, cancel or refrain from modifying, renewing, continuing or cancelling any Bond.*

Paragraph Five of the Agreement is titled "Indemnity". This paragraph states the following:

*Indemnitors shall exonerate, hold harmless, indemnify, and keep indemnified Surety from and against any and all Loss and/or liability for Loss. Indemnitors agree to immediately reimburse Surety in the amount of any payment of Loss made by Surety plus interest from the date of Surety's payment. Surety shall be entitled to charge for any and all such disbursement made by it in Good Faith under the belief that it is or was liable for the sums so dispersed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed. The vouchers or other evidence of any such payments made by Surety shall be prima facie evidence of the amount of Loss and of the fact and amount of Indemnitors' liability to Surety. All such amounts shall bear interest at the rate of 9% per annum from the date of Surety's Payment until Surety is fully reimbursed.*

Paragraph Six of the Agreement is titled, "Collateral Deposit". This paragraph states the following:

3

*Upon written demand by Surety, Indemnitors shall deposit with Surety cash or an irrevocable letter of credit from a bank approved by Surety and in the form acceptable to Surety (hereinafter "Collateral Deposit"). Such Collateral Deposit shall be in amount that Surety, in its sole discretion, in Good Faith deems sufficient to collateralize and hold it harmless from and against any and all potential liability for Loss, whether such liability is contingent or noncontingent, disputed or undisputed, and whether or not Surety shall have established a reserve or made any payments therefor. It is agreed that the failure of the Indemnitors to make any Collateral Deposit demanded by Surety shall cause irreparable harm to Surety for which Surety has no adequate remedy at law, and that Surety shall be entitled to preliminary and final injunctive relived for specific performance of Indemnitors' Collateral Deposit obligation. Indemnitors further expressly waive any objection or defense based upon Surety's delay or failure to act to enforce its right to specific performance hereunder, which may be enforced at any time at Surety's sole discretion.*[2]

## III.    STATEMENT OF FACTS – BACKGROUND

Budget Services and ML Builders are contractors that primarily work on government installations.[3] Budget Services is owned by Willie Billingslea while ML Builders is managed by Shawn and Jonathan McCullough.[4] On June 12, 2018, Budget Services and ML Builders formed a joint venture, the purpose of which was to obtain construction jobs for the U.S. Department of Veterans Affairs.[5] In December 2019, the joint venture needed a surety to provide bonds for potential jobs.[6] As a result, Kenny Albert, a bond account agent with Houchens Insurance Group, facilitated a business relationship between the joint venture and the Plaintiff.[7] Before issuing any bonds, Plaintiff requested that the joint venture execute a general indemnity agreement.[8] On December 4, 2019, Plaintiff sent Kenny Albert an agreement that only covered the joint venture; however, ML Builders expressed a desire to receive its own bonds outside of the joint venture.[9]

---

[2] Indemnity Agreement (attached hereto as Exhibit A)
[3] Joint Venture Agreement (attached hereto as Exhibit B)
[4] *Id.*
[5] *Id.*
[6] Internal Summary of ML Builders' Account (attached hereto as Exhibit C)
[7] Deposition of Kenny Albert, 9:21 – 10:6; 12:12 - 21
[8] *Id.* at 12:23 - 24
[9] Initial Indemnity Agreement (attached hereto as Exhibit D); Dep. of Kenny Albert, 13:8 – 14:4

The indemnity agreement was re-drafted so that it would cover the joint venture, and both Budget Services and ML Builders as individual contractors.[10]

On January 21, 2020, the Agreement was executed by the joint venture, Budget Services, and ML Builders.[11] Six days before the Agreement was executed, Kenny Albert sent an email to Willie Billingslea and Shawn McCullough to confirm that everyone understood how the updated agreement would work.[12] In this email, Kenny Albert stated,

*"Attached you will find a new General Indemnity Agreement. The new GIA is worded, so we can use the same GIA for the JV, or each company separately. This gets rid of the need to have separate GIA's prepared and signed for each entity."*[13]

Pursuant to this email, both Plaintiff and the indemnitors understood the alternative to the Agreement would have been three separate indemnity agreements: One for the joint venture, one for Budget Services, and one for ML Builders.[14] Furthermore, ML Builders would not have been a signatory on the agreement sent to Budget Services, and Budget Services would not have been a signatory on the agreement sent to ML Builders.[15] On April 13, 2020, after the Agreement was executed, all parties re-confirmed that they understood how the Agreement would operate.[16]

Before Plaintiff would approve a bond, it required financial statements from the indemnitors to confirm the indemnitor was financially stable.[17] Plaintiff began issuing bonds exclusively to ML Builders in July 2020; and by August 2020, Plaintiff began having concerns about ML Builders' financial statements.[18] Specifically, ML Builders had not produced a CPA statement from December 2019.[19] By December 2020, Plaintiff received three different versions of ML Builders' in-house financials and learned that ML Builders had issues completing large jobs.[20] In June 2021, Plaintiff realized that it had not received ML Builders' CPA statement from December 2020.[21] Despite lacking adequate financial statements, Plaintiff continued to issue bonds to ML Builders.[22]

---

[10] Email from Kenny Albert (January 15, 2020) (attached hereto as Exhibit E)
[11] See Exhibit A
[12] See Exhibit E
[13] *Id.*
[14] Dep. of Kenny Albert, 18:2 – 19:2
[15] *Id.* at 19:14 – 20:3
[16] Email from Willie Billingslea (April 13, 2020) (attached hereto as Exhibit F)
[17] Deposition of Plaintiff, 34: 9 – 20; Dep. of Kenny Albert, 21:12 – 22
[18] See Exhibit C
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

On July 16, 2021, Kenny Albert requested updated financial statements from Budget Services.[23] Willie Billingslea responded that he would not send updated financials until he spoke with Shawn McCullough.[24] On July 30, 2021, Willie Billingslea sent an email to Shawn McCullough, stating he was going to tell Kenny Albert he wanted to be taken off the Agreement.[25] In September 2021, Kenny Albert informed Plaintiff that Budget Services would not be sending any more CPA statements; however, three months later, he requested information from Willie Billingslea's certified public accountant without permission.[26]

Throughout the latter half of 2021, Plaintiff continued to notice deficient and concerning financial statements from ML Builders.[27] The personal financial statements for Shawn and Jonathan McCullough revealed deficit equity positions, and ML Builders failed to provide fiscal year-end statements from 2019, 2020, or 2021.[28] Plaintiff also learned ML Builders completed minimal work on projects.[29] Despite these issues, Plaintiff continued to issue bonds to ML Builders.[30]

In 2022, Kenny Albert moved ML Builders' account without informing Plaintiff.[31] When Plaintiff discovered the account had been moved, it learned the account was moved for additional surety credit.[32] In 2023, Plaintiff began receiving claim notices on the bonds it issued to ML Builders; and on May 15, 2023, Plaintiff sent Defendants a demand for indemnification.[33] None of the "Bonded Projects" listed in Plaintiff's complaint are comprised of bonds issued to the joint venture or Budget Services.[34] Plaintiff, nevertheless, alleges that the Agreement was always intended for each contractor to provide indemnity for bonds exclusively issued to the other.[35]

---

[23] Email from Kenny Albert (July 16, 2021) (attached hereto as Exhibit G)
[24] Email from Willie Billingslea (July 28, 2021) (attached hereto as Exhibit H)
[25] Email from Willie Billingslea (July 30, 2021) (attached hereto as Exhibit I)
[26] See Exhibit C; Email from Pamela Fanelli (December 3, 2021) (attached hereto as Exhibit J)
[27] See Exhibit C
[28] Id.
[29] Id.
[30] Id.
[31] Id.; Dep. of Plaintiff, 53: 3 - 13
[32] See Exhibit C
[33] Id.; Demand for Indemnification (attached hereto as Exhibit K)
[34] See Exhibit C; Plaintiff's Response to Defendants' Request for Admission No. 3
[35] Dep. of Plaintiff, 29: 5 - 11

## IV.    ARGUMENT AND CITATION OF AUTHORITY

### A.  Summary Judgment Standard

Summary Judgment may be entered in favor of the movant where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[36] The movant is not required to negate the non-movant's claim, but only needs to show that there is an absence of evidence to support the non-movant's case.[37] Once the movant meets their burden, the burden shifts to the non-movant to prove a genuine issue of material fact.[38] A fact is only "material" if the evidence is of such a quality that a reasonable jury could return a verdict for the non-movant.[39] If the non-movant cannot produce such evidence, the movant is entitled to summary judgment as a matter of law.[40]

### B.  The Agreement is Unenforceable Because it is an Invalid Contract

Plaintiff alleges that Defendants are liable for its claims under the Agreement. To prove liability, however, the Plaintiff must prove that the Agreement is a valid contract.[41] When interpreting a contract for indemnity, the words of the contract must be construed strictly against the indemnitee.[42] Similarly, any ambiguity in the contract must be construed against the drafter.[43] Every presumption in construing the contract should be against an intention to indemnify.[44]

### 1.  Plaintiff's Promise in the Agreement is Illusory

For a contract to be valid, it must be supported by consideration.[45] One type of consideration the law recognizes is mutual promises, otherwise known as "a promise for a

---

[36] *Manning v. Engelhard Corp.*, 929 F.Supp. 1508, 1511 (1996)
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *See, Auto-Owners Insurance Co. v. CW Masonry, Inc.*, 350 Ga.App. 401, 406 (2019) (observing that indemnity agreements are interpreted under the rules governing contracts); *Milliken & Co. v. Georgia Power Company*, 354 Ga.App. 98, (2020)
[42] *Service Merchandise Co. v. Hunter Fan Co.*, 274 Ga.App. 290, 292 (2005)
[43] *Id.*
[44] *Id.*
[45] O.C.G.A. § 13-3-42; *Pabian Outdoor-Aiken, Inc. v. Dockery*, 253 Ga.App. 729 (2002) (quoting Morrow v. Southern Exp. Co., 28 S.E. 998, 999 (1897))

promise".[46] A mutual promise, however, is only adequate consideration if each party has a right to hold the other to the agreement.[47] Thus, a contract based on mutual promises is only supported by consideration if both parties' promises are concurrent and obligatory at the same time.[48] A promise is a manifestation of an intent to act, or refrain from acting, in a specified way.[49] An illusory promise, on the other hand, exists when a party uses words of promise, but in actuality makes their performance entirely optional.[50] These promises are illusory because "to agree to do something and reserve the right to cancel the agreement at will is no agreement at all".[51] A promisor cannot manifest an intent to be bound by the contract, but reserve the option to change that intention.[52] In other words, a promise is illusory if the promisor essentially says "I will if I want to".[53] An illusory promise does not create an obligation for the promisor; and if an illusory promise is present in a contract based on mutual promises, the promises cannot be obligatory at the same time.[54] Thus, under Georgia law, such contracts are unenforceable for lack of adequate consideration.[55]

In *National Surety Co. v. City of Atlanta*, the city sued a surety for breach of a bond when the principal, a coal company, allegedly failed to fulfill its contractual obligations.[56] The city contracted with the company for the delivery of coal over a period of twelve months; but under the contract terms, the city retained the right to refuse deliveries upon giving notice to the company.[57] The defendant demurred the complaint on the grounds that the contract was void because the contract fixed no binding obligation on the city.[58] The demurrer was overruled by the trial court and this ruling was affirmed by the Court of Appeals.[59] The Georgia Supreme Court, however, reversed.[60] The contract left it entirely optional with the city to take or refuse the coal,

---

[46] *Dockery*, 253 Ga.App. at 729
[47] *Id.*
[48] *Id.*
[49] *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1373 (2005)
[50] *Id.* at 1374; *See also*, *Lambert v. Austin Ind.*, 544 F.3d 1192, 1196 (2008); *Norfolk Southern Railway Co. v. Langdale Forest Products Co.*, 655 F.Supp. 3d 1325, 1338 (2023); *NGM Insurance Co. v. Abate*, 367 Ga.App. 419, 424 (2023) (observing that an illusory promise exists when a condition of the contract is completely within the control of the promisor)
[51] *Abate*, 367 Ga.App. at 424
[52] *See*, *Kemira, Inc. v. Williams Investigative & Sec. Services, Inc.*, 215 Ga.App. 194, 198
[53] *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1311 (1998)
[54] *Compare*, *FPL Group, Inc.*, 165 F.3d at 1311, *with Kemira, Inc.*, 215 Ga.App. at 198
[55] *Lambert*, 544 F.3d at 1196
[56] 106 S.E. 179, 180 (1921)
[57] *Id.* at 181
[58] *Id.* at 180
[59] *Id.*
[60] *Id.* at 181

and the court observed that "if the purchaser can at pleasure cancel an agreement to purchase, he has incurred no obligation."[61] The contract was not valid because there was no obligation upon both parties.[62]

In *FPL Group, Inc.*, a contractor brought a breach of contract claim against a cable company.[63] The contractor alleged that the contract consisted of three documents: (1) The signed contractual agreement, (2) a letter from the contractor's president to the cable company's vice-president, and (3) A "Materials Requisition Budget" showing that the cable company estimated 1,250 miles of cable construction work.[64] The signed contract contained a provision in which the cable company was required to offer the contractor the right of first refusal on any projects the company had, but the provision placed no obligation on the contractor in return.[65] The contractor later accepted the company's offer to reconstruct cable lines in a townhouse community; but after the property's sprinkler system was damaged, both parties claimed the other was responsible for the cost of repair.[66] The cable company eventually covered the cost and terminated the agreement with contractor, claiming that the contractor failed to comply with material terms of the contract.[67] The contractor then sued the cable company for breach of contract, alleging that the Materials Requisition Budget contractually obligated the company to provide construction work for at least 1,250 miles of cable.[68]

At the close of trial, the district court granted the defendants Rule 50(a) motion.[69] In doing so, the district court held that the contract did not guarantee the contractor a certain mileage of cable construction work.[70] The Eleventh Circuit Court of Appeals affirmed.[71] The appellate court found that the "right of first refusal" provision was an illusory promise.[72] The court observed that the contract "placed no obligations on [the contractor] in terms of either quantity of work performed or price charged for such work."[73] The provision made clear that the contractor could

---

[61] *Id.*
[62] *Id.*
[63] 162 F.3d at 1302
[64] *Id.*
[65] *Id.* at 1297
[66] *Id.* at 1299
[67] *Id.*
[68] *Id.* at 1302
[69] *Id.* at 1305-1306
[70] *Id.*
[71] *Id.* at 1313
[72] *Id.* at 1312-1313
[73] *Id.*

"turn down every offer from [the cable company], and thus do no work whatsoever."[74] Essentially, the cable company bound itself to offer the contractor all of its construction work, but the constructor reserved the right to only accept the wok if doing so would be in its self-interest, however it perceived that interest to be.[75] The court concluded, that such a promise was illusory and was inadequate consideration for the contract.[76]

In the present case, the Agreement is ostensibly supported by mutual promises. Paragraph One of the Agreement, along with the recitals, contain the mutual promises between Plaintiff and the indemnitors. Plaintiff promises to provide bonds to the indemnitors if the indemnitors promise to indemnify Plaintiff according to Paragraphs Five and Six of the Agreement. Under Georgia law, mutual promises can be adequate consideration for a contract, but only if the promises are concurrent and obligatory at the same time. Thus, the promises in the Agreement are only adequate consideration if Plaintiff's obligation to provide bonds arose at the same time as the indemnitors' obligation to indemnify Plaintiff for any "Loss". When the indemnitors executed the Agreement on January 21, 2020, their obligations were solidified. If Plaintiff issued a bond to an indemnitor and suffered a "Loss", the indemnitor was required to indemnify Plaintiff. No indemnitor reserved a right to refuse to perform according to their promise. The same cannot be said of Plaintiff.

Paragraph Three of the Agreement renders Plaintiff's promise illusory. This paragraph essentially states that Plaintiff reserves the right to refrain from executing any bonds whatsoever. In its deposition, Plaintiff's representative, Richard Towle, was asked, "Is the surety, which I understand to be United Fire, obligated to issue any bonds under this agreement?".[77] Mr. Towle responded, "No, the bonds are agreed to at the sole discretion of the surety."[78] Furthermore, Paragraph Three explicitly states that Plaintiff can refrain from executing bonds "without impairing the obligations of Indemnitors under this Agreement". This language shows that Plaintiff expressly reserved the right to not fulfill it promise while ensuring that the indemnitors were bond to theirs. In this way, Plaintiff's promise is analogous to the contractor's promise in *FPL Group, Inc.* Although that case applied Florida law, Georgia and Florida adhere to the same basic

---

[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] Dep. of Plaintiff, 23:19 - 25
[78] *Id.*

principles of illusory promises.[79] Like the contractor's promise, Plaintiff's promise placed no obligation on the amount of bonds it would issue; and ultimately, Plaintiff could refuse to issue any bonds at all. While Plaintiff initially manifested an intent to provide bonds to the indemnitors, it reserved a right to change that intention if it so desired. Ultimately, while ensuring that the indemnitors would be bound by their obligations, Paragraph Three allows the Plaintiff to say, "I will only issue bonds if I want to". This is the very essence of an illusory promise. Plaintiff's promise does not obligate it to perform under the Agreement; and because the mutual promises are not obligatory at the same time, the Agreement is not supported by adequate consideration.

## 2. The Agreement Lacks Mutual Assent

For a contract to be valid, both parties must assent to all essential terms of the contract.[80] An agreement between two parties will occur only when "the minds of the parties meet at the same time, and in the same sense".[81] In other words, mutual assent does not exist until both parties have the same understanding on all contract terms.[82] The Georgia Supreme Court has stated,

"In determining whether there was a mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of intent."[83]

The court has also observed that the circumstances surrounding the making of the contract are relevant to determining mutual assent, and courts can consider extrinsic evidence such as correspondence and discussions.[84] Such communications can be considered because they are not offered to contradict a valid contract; rather, they are offered to show no valid contract ever

---

[79] *Compare*, *FPL Group, Inc*., 162 F.3d at 1311 (observing that Florida law adheres to the principle that an illusory promise is inadequate consideration), *with Lambert*, 544 F.3d at 1196 (observing that an illusory promise is inadequate consideration in Georgia)

[80] O.C.G.A. § 13-3-1; *Hammond v. Innomed Technologies, Inc.*, 309 Ga.App. 265, 266 (2011); *Thomas v. Chance*, 325 Ga.App. 716, 718 (2014)

[81] *Wright v. Nelson*, 358 Ga.App. 871, 874 (2021)

[82] *Williams v. Corporation of Mercer University*, 542 F.Supp.3d 1366, 1376 (2021)

[83] *Cox Broadcasting Corp. v. National Collegiate Athletic Ass'n*, 250 Ga. 391, 395 (1982)

[84] *Id.*

existed.[85] When analyzing these communications, assent is only judged by the parties' overt acts and words.[86] Subjective intent is irrelevant.[87]

Furthermore, Georgia courts only consider circumstances that were contemporaneous to contract formation. In *Extremity Healthcare, Inc.*, members of a joint venture brought action against exiting members, seeking declaratory judgment that the parties' buyout agreement was void for lack of mutual assent.[88] The joint venture was created when a group of podiatrists and a group of nurse anesthetists agreed to establish a surgery center.[89] The venture fell apart and the two groups reached an agreement in which the podiatrist would buy out the nurses' venture interests.[90] A lease assignment, which would give the nurses' rights to the venture's office to the podiatrists, was attached to the agreement as an exhibit.[91] Before the agreement was executed, a dispute arose between the nurses and the office's landlord. [92] To settle this dispute, the landlord requested the lease be amended to extend the lease term; however, the nurses, not wanting to incur any obligations under the extended lease, rejected the amendment.[93] After the agreement was executed, the landlord refused to approve the attached lease assignment because the nurses declined the extension.[94] Without the lease assignment, the podiatrists refused to pay the nurses under the agreement.[95] When the nurses asserted breach of contract and sought arbitration, the podiatrist filed for judgment declaring that the contract lacked mutual assent.[96] The trial court granted summary judgment for the nurses and the Court of Appeals affirmed.[97]

The podiatrist relied on emails sent after the agreement was executed to show the absence of mutual assent.[98] Although the agreement was complete, the emails stated it would not be final until the landlord approved the lease assignment.[99] The appellate court rejected the nurse's assertion that the unambiguous language of the agreement prohibited consideration of the

---

[85] *See, Extremity Healthcare, Inc. v. Access to Care America, LLC*, 339 Ga.App. 246, 254 (2016)
[86] *See, Sidhom v. Boutros*, 358 Ga.App. 432, 435 (2021)
[87] *Id.*
[88] 339 Ga.App. at 249
[89] *Id.* at. 247
[90] *Id.*
[91] *Id.* at 248
[92] *Id.*
[93] *Id.* at 249.
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.* at 250-258
[98] *Id.* at 254
[99] *Id.*

emails.[100] The podiatrists were not offering the emails to vary the terms of a valid agreement but were offering them to show that no valid agreement was established.[101] The court observed that "even though a writing purports to be a complete integration, evidence of negotiations is admissible to show that no enforceable agreement was reached".[102] The court, nonetheless, found that because they were not contemporaneous with contract formation, the emails did not show a lack of mutual assent .[103] There was no evidence that the content of the emails was communicated prior to or at the time of the agreement's execution.[104] Rather, the emails were only communicated after the agreement was executed.[105] Because the podiatrists did not communicate the meaning they ascribed to the agreement until after it became binding, that meaning was secret to the nurses at the time of contract formation.[106] The court observed that only overt acts, not secret intent, could be considered in determining the presence of mutual assent; and thus, the podiatrists' reliance on emails sent after the agreement was executed was misplaced.[107]

Under the present facts, the court in *Extremity Healthcare Inc.* would come to a different conclusion. The court would find that there was no mutual assent for Budget Service to indemnify losses on bonds issued solely to ML Builders. The Agreement defines a "bond" as any bond given to an indemnitor solely or as co-venturer with others; and before the Agreement was executed, Kenny Albert sent an email to Willie Billingslea and Shawn McCullough on Plaintiff's behalf. This email was to verify that all parties understood how the agreement would operate. The email stated that the Agreement would be worded to get rid of the need to send separate indemnity agreements to each entity. In Kenny Albert's deposition, he details how the alternative to the Agreement's wording would have worked.[108] The alternative would have been three separate indemnity agreements: one for ML Builders, one for Budget Services, and one for the joint venture.[109] ML Builders would not have signed the agreement that was sent to Budget Services, and Budget Services would not have signed the agreement that was sent to ML Builders.[110]

---

[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.* at 255
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.* at 255-256
[108] Dep. of Kenny Albert, 18:2-23
[109] *Id.*
[110] *Id.* at 19:14-22

Essentially, Budget Services would not be bound by the agreement sent to ML Builders, and vice versa. The Agreement was worded to take this understanding of the separate agreements and "put it all on one".[111] When the Agreement was executed on January 21, 2020, this is the meaning that Willing Billingslea and Budget Services ascribed to Plaintiff's intent.[112] This email was an overt act from Plaintiff, and Willie Billingslea can only be held to have known the intentions Plaintiff manifested through its overt acts. By sending this email, Plaintiff manifested an intent that the Agreement would simply consolidate an arrangement in which both contractors would be responsible for bonds issued to the joint venture, but neither would be responsible for bonds solely issued to the other.

Furthermore, any correspondence Plaintiff had with Willie Billingslea after the Agreement was executed should not be considered in the determining whether Budget Services assented to provide indemnity for ML Builder's bonds. Kenny Albert testified that Willie Billingslea understood Plaintiff's real intentions for the Agreement because of multiple post-execution correspondences. On April 13, 2020, Kenny Albert sent another email to Willie Billingslea to verify that all parties understood how the Agreement would operate.[113] Willie Billingslea confirmed that he agreed because he interpreted this email the same as the one sent on January 15th.[114] On December 29, 2020, Plaintiff obtained personal and business financial statements from Willie Billingslea. On June 29, 2021, Kenny Albert alleges that Willie Billingslea told him that Budget Services would be involved in projects ML Builders had in a different joint venture.[115] He also alleges that in July 2021, he spoke to Willie Billingslea about the bonding program, and that Willie Billingslea confirmed that the Agreement applied to ML Builders' bonds.[116] Defendants maintain that these allegations, and others like them, are either completely false or support their position. But even in the light most favorable to Plaintiff, these correspondences are irrelevant. Pursuant to *Extremity Healthcare Inc.*, these correspondences have no bearing on mutual assent because they occurred after the Agreement was executed. Like the emails in that case, any reliance on these correspondences by Plaintiff would be misplaced.

---

[111] *Id.* at 18:8-10
[112] Deposition of Willie Billingslea, 40:12 – 43:10
[113] Dep. of Kenny Albert, 26:19 – 29:14
[114] Dep. of Willie Billingslea, 48:14 – 50:18
[115] Dep. of Kenny Albert, 43:4 – 44:12
[116] *Id.* at 46:3-10

The undisputed facts show that Plaintiff's overt act manifested an intent for each contractor to be responsible for bonds that were issued solely to that contractor. It was not until after the Agreement was executed, that Plaintiff manifested an intent for the contractors to be responsible for bonds issued exclusively to the other. Like the intent expressed in the podiatrist's emails, Plaintiff's actual intent for the Agreement was secret to Willie Billingslea at the time of contract formation. Thus, when it comes to the scope of each contractor's indemnity, the minds of the parties did not meet at the same time and in the same sense.

### 3. The Agreement Lacks Consideration

Defendants maintain the Agreement lacks consideration due to Plaintiff's illusory promise; however, if the Court disagrees, the Agreement is still invalid for lack of consideration. Every contract must be founded on valid consideration, and consideration is valid if it is either a benefit that accrues to the promisor or a disadvantage endured by the promisee.[117] If consideration is the latter, the promisee must have suffered a detriment resulting from its reliance on the promisor's promise.[118] A total failure of consideration renders a contract void.[119]

Here, Defendants did not receive a benefit from Plaintiff's promise, nor did Plaintiff suffer a detriment from the Defendants' promise. As discussed *supra*, Plaintiff promised to provide bonds to the contractors and the contractors promised to indemnify any losses on those bonds. Defendants did receive a benefit because they did not receive any bonds from Plaintiff. All the bonds that comprise the "Bonded Projects" were issued exclusively to ML Builders. Furthermore, any detriment endured by Plaintiff was not in reliance of any promise made by the Defendants. The undisputed facts show that Defendants promised to indemnify losses on bonds issued to the joint venture and Budget Services. Defendants never promised to indemnify bonds solely issued to ML Builders. Consequently, Plaintiff's reliance on Defendants to indemnify such bonds is erroneous. Because Defendants did not receive a benefit from Plaintiff's promise, and Plaintiff did not suffer a detriment from the Defendants' promise, the Agreement is void for lack of consideration.

---

[117] O.C.G.A.§13-3-1; *Zachos v. Citizen & Southern Nat. Bank*, 213 Ga. 619, 624 (1957)

[118] *See*, *Vanguard Properties Development Corp. v. Murphy*, 136 Ga.App. 519, 521

[119] *McDuffie v. Criterion Cas. Co.*, 214 Ga.App. 818, 821 (1994); *Ball-Rodriguez v. Progressive Premier Insurance Co. of Illinois*, 367 Ga.App. 481, 483 (2023)

15

## C. The Agreement is Unenforceable Due to Public Policy

Georgia public policy is reluctant to cast the burden of negligent actions upon those who are not actually at fault.[120] The rationale behind this policy is to "assure that people exercise due care in their activities for fear of liability, rather than act carelessly in the knowledge that indemnity insurance will relieve them."[121] Thus, contractual indemnities only cover losses caused by an indemnitee's negligence if the contract expressly states that such negligence is covered.[122] Negligence occurs when a person fails to use due diligence; and naturally, due diligence is the degree of care which is exercised by ordinarily prudent persons under the same or similar circumstances.[123]

In *Travelers Indemnity Co. v. A.M. Pullen & Co.*, a contractor agreed to indemnify a surety in exchange for bonds on multiple construction jobs.[124] In order to protect itself, the surety endeavored to learn the contractor's financial condition.[125] The surety requested financial statements from the contractor and hired an independent audit firm.[126] In reliance on the reports prepared by the audit firm, the surety issued millions of dollars in bonds to the contractor.[127] The contractor, however, became financially unstable and defaulted on some of its projects.[128] The surety had to pay a significant sum on the defaulted contracts; and as a result, it brought action against the audit firm for negligent performance of auditing services.[129] The trial court granted the audit firm's motion for summary judgment, but the Court of Appeals reversed.[130] The audit firm argued that the surety did not exercise due diligence to protect its own interests, but continued to issue bonds long after it was aware of the contractor's difficulties.[131] The appellate court observed, however, that the surety presented much evidence that it exercised great care to protect its

---

[120] *Ryder Integrated Logistics Inc. v. BellSouth Telecommunications, Inc.*, 281 Ga. 736, 737 (2007); *See also*, *Travelers Property Casualty Co. of America v. CVB Industrial Contracting, Inc.*, 697 F.Supp.3d 1334, 1354 (2023)
[121] *Allstate Ins. Co. v. City of Atlanta*, 202 Ga.App. 692, 693 (1992)
[122] *Ryder Integrated Logistics Inc.*, 281 Ga. at 737
[123] O.C.G.A. § 51-1-2; *Beard v. Audio Visual Services, Inc.*, 260 Ga.App. 476, 477 (2003)
[124] 161 Ga.App. 784 (1982)
[125] *Id.*
[126] *Id.*
[127] *Id.* at 784-785
[128] *Id.*
[129] *Id.*
[130] *Id.* at 790
[131] *Id.*

16

interests.[132] Consequently, a substantial question of fact remained as to whether the surety exercised due diligence.[133]

Although questions of due diligence are often reserved for a jury, a person may fail to use due diligence as a matter of law.[134] In *Johnson*, the plaintiff brought action against a buyer and buyer's bank for misrepresenting the buyer's assets.[135] The plaintiff owned a car dealership and agreed to sell it to the buyer for $650,000; however, the agreement could only proceed with the approval of Ford Motor Company, which had a security interest in the dealership.[136] To obtain this approval, the buyer and his bank created a plan in which buyer would deposit a worthless check in his account and the bank's vice president would write letter verifying the deposit.[137] After receiving the letter, which stated buyer had deposited over $200,000, Ford gave approval for the agreement and informed plaintiff of the buyer's assets.[138] The check, however, was inevitably rejected; and a result, the buyer was unable to obtain a loan for his purchase of the dealership.[139] Plaintiff attempted to help the buyer find financing but discovered that the buyer could not even make a $5,000 earnest money deposit.[140] Plaintiff, nevertheless, declined to investigate this discrepancy in buyer's assets and failed to obtain any financial statements from him.[141] At trial, the court denied the bank's motion for directed verdict and a jury found in favor of plaintiff.[142] The bank appealed, arguing that plaintiff's reliance on its representation of buyer's assets was not justified.[143] The Court of Appeals agreed and reversed the denial of directed verdict.[144]

The appellate court found that directed verdict was appropriate because the plaintiff failed to use due diligence as a matter of law.[145] The court observed that the plaintiff had amble reason

---

[132] *Id.* at 788
[133] *Id.* at 790
[134] *Citizens Bank of Ball Ground v. Johnson*, 191 Ga.App. 155, 158 (1989); *Antley v. Small*, 360 Ga.App. 617, 621 (2021); *See also, Dyer v. Honea*, 252 Ga.App. 735, 738 (2001) (finding that plaintiff failed to use due diligence as a matter of law because of his blind reliance on the accuracy of financial statements); *Beard*, 260 Ga.App. at 273 (observing that failure to use due care can be decided by summary judgment when undisputed facts exist on which reasonable minds could not differ)
[135] *Johnson*, 191 Ga.App. at 157
[136] *Id.* at 155-156
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] *Id.* at 157
[141] *Id.*
[142] *Id.* at 157 – 158
[143] *Id.*
[144] *Id.*
[145] *Id.*

to question the buyer's financial strength.[146] Plaintiff failed to obtain financial statements and investigate the discrepancy in buyer's assets.[147] Instead, he placed complete faith in a single letter that stated the buyer had $200,000.[148] The court concluded that the circumstances of the case would have alerted any reasonable businessman that he needed to verify the buyer's financial position.[149] Because, plaintiff failed to take any steps to make such verification, he failed to use due diligence as a matter of law.[150]

In the present case, Plaintiff failed to use due diligence in issuing bonds to ML Builders. The undisputed facts show that from 2020 to 2022, Plaintiff failed to receive timely and adequate financial statements from ML Builders. By December 2020, Plaintiff had three different versions of ML Builders' in-house financial statements and never received a December 2019 CPA statement. By June 2021, Plaintiff had not received ML Builders' December 2020 CPA statement. In January 2022, Plaintiff received personal financials from Shawn and Jonathan McCullough which showed they had deficit equity positions. Additionally, Plaintiff learned that ML Builders had issues with completing projects. In December 2020, Plaintiff discovered that ML Builders had tax liens in other states due to delays on construction projects; and in December 2021, Plaintiff leaned that ML Builders had completed minimal work on its current projects. These are circumstances that would have alerted any reasonable surety that it needed to verify the indemnitors' financial position. Plaintiff, however, failed to do so. Instead, it continued to carelessly issue bonds to ML Builders based on financial information it obtained from Budget Services in December 2020. Plaintiff continued to put blind faith in Budget Services even after Kenny Albert informed Plaintiff that it would not be receiving further CPA statements from Budget Services. Mr. Towle testified that when financial statements from Budget Services stopped coming in, "it should have raised some issued with the underwriters".[151] Also, when asked about Plaintiff's policy regarding non-compliance with providing financials documents, Mr. Towle stated, "What you would do is not issue any more bonds."[152] Mr. Towle does attempt to justify the continued issuance of bonds by claiming that Plaintiff simply trusted ML Builders'

---

[146] *Id.*
[147] *Id.*
[148] *Id.*
[149] *Id.*
[150] *Id.*
[151] Dep. of Plaintiff, 51:22 – 52:8
[152] Id. at 52:17 – 22

representations.[153] Like the discrepancy in *Johnson*, however, the repeated failure to provide financial statements should have alerted Plaintiff to take more thorough and earnest action to verify ML Builder's financial position.

Furthermore, Plaintiff's own review of how ML Builder's account was handled shows that it failed to use due diligence. The review states, "When FYE [and] CPA statements weren't provided as promised, we should have been quicker to cut off support." The review also states, "...After following up on them [sub bonds] multiple times and not receiving them, we should not have allowed them [ML Builders] to lean on sub bonds to support approvals." Further, the review states, "...a lack of CPA financials and questionable internal accounting abilities could have been grounds for declining additional bonded work." These internal critiques show that the present case is distinguishable from *Travelers Indemnity Co.* In that case, the court reversed summary judgment because the surety presented "much evidence" to create a substantial question of fact. Here, the undisputed facts show Plaintiff's acknowledgment of its failure to use due care. Thus, reasonable no substantial fact exists on whether Plaintiff failed to use due diligence.

Notably, the review also acknowledges that Plaintiff was "too comfortable with 3rd party indemnification" and "relied too heavily on the strength of Willie's personal net worth." Here, Plaintiff's own observation of its conduct mirrors the specific conduct that Georgia public policy seeks to avoid. Plaintiff carelessly issued bonds to ML Builders in the knowledge that a third-party indemnitor would relieve it. Because Plaintiff failed to use due diligence in issuing bonds to ML Builders, its losses were the result of its own negligence. There is no provision in the Agreement that permits Plaintiff to be indemnified for its own negligence; and as a result, the Agreement is unenforceable under Georgia public policy.

## V.    CONCLUSION

For Plaintiff to prevail on its claims, it must prove that the Agreement is an enforceable contract. The undisputed facts, however, demonstrate that the Agreement is not enforceable.

First, the Agreement is not a valid contract because Plaintiff's promise is illusory. The Agreement is based on mutual promises; and as result, the parties' promises must be obligatory at the same time to constitute adequate consideration. If one party's promise is illusory, their promise does not create any obligations for them under contract. An illusory promise occurs when the party

---

[153] Id. at 51: 2-14

making the promise reserves the right to not be bound by the contract. Here, Plaintiff made such a reservation. Under the Agreement, Plaintiff promised to provide bonds to the contractors in exchange for indemnity. Paragraph Three, however, reserves the right for Plaintiff to not issue any bonds at all. Because Plaintiff is not obligated to provide bonds under the Agreement, its promise is illusory. Consequently, the Agreement is not supported by adequate consideration as Plaintiff's promise did not become obligatory at the same time as the Defendants' promise to provide indemnity.

Second, the Agreement is not a valid contract because it lacks mutual assent. Before the Agreement was executed, Kenny Albert sent an email to the contractors to verify that all parties understood how indemnity would operate. The email stated the Agreement was worded to mirror an arrangement in which each contractor would be sent separate indemnity agreements that would not be signed be signed by the other contractor. Thus, the email expressed an understanding that both contractors would be responsible for bonds issued to the joint venture, but neither would be responsible for bonds issued exclusively to the other. Defendants executed the Agreement with this understanding; however, Plaintiff now asserts that its understanding was always that Defendants would indemnify losses on bonds issued to ML Builders. In determining mutual assent, Georgia law permits courts to consider extrinsic evidence such as correspondences and discussions. Such evidence, however, is only considered if they were contemporaneous with contract formation. Here, Kenny Albert's email is contemporaneous with the Agreement's execution because it was sent six days prior. Thus, the understanding expressed in that email is appropriate in determining the parties' assent. Any intentions expressed in post-execution correspondences, however, are not. If Plaintiff's understanding was that the contractors would be responsible for bonds exclusively issued to the other, that understanding was secret to Defendants at the time of the Agreement was executed. Because there was no meeting of the minds regarding the scope of Defendants' indemnity, the Agreement lacks mutual assent.

Third, the Agreement is not valid because it lacks consideration. A contract must be supported by consideration, and consideration must be either a benefit to the promisor or a disadvantage for the promisee. The undisputed facts show that Plaintiff promised to provide bonds to the contractors and Defendants promised to indemnify losses on bonds issued to the joint venture or Budget Services. Defendants were not issued any bonds; and although Plaintiff may have suffered a detriment, the detriment was not in reliance of any promise made by Defendants. Since

Defendants did not receive a benefit and Plaintiff did not suffer a disadvantage, the Agreement lacks consideration.

Finally, enforcement of the Agreement would violate Georgia public policy. Georgia does not permit indemnity for one's own negligence absent an express provision to the contrary. Furthermore, a person is negligent if they fail to use due diligence in their actions. Here, the undisputed facts show that, as a matter of law, Plaintiff failed to use due diligence in issuing bonds to ML Builders. Plaintiff repeatedly had concerns over ML Builders' financial stability due to insufficient financial statements and ML Builders' difficulty completing jobs. These are circumstances in which any reasonably surety would have been alerted that it needed to verify ML Builder's financial position. Plaintiff, however, continued to issue bonds to ML Builders despite multiple signals that it should stop. Plaintiff's own internal review stated that Plaintiff should have been quicker to cut off support to ML Builders and that it relied too heavily on indemnification from the Defendants. Essentially, Plaintiff acted carelessly in the knowledge that indemnity could relieve them. This is the very conduct that Georgia public policy seeks to avoid. Plaintiff's continued issuance of bonds to ML Builders was negligent and no provision in the Agreement permits Plaintiff to receive indemnity for its own negligence. Thus, public policy prevents its enforcement.

Because the Agreement is unenforceable, summary judgment should be granted for Defendants on all of Plaintiff's claims.

Respectfully submitted, this 28th of October, 2024.

CHRISTOPHER GORDON
Georgia Bar No. 922377
JOSHUA SNELL
Georgia Bar No. 615678
Attorneys for Defendants

JAMES-BATES-BRANNAN-GROOVER-LLP
P.O. Box 4283
Macon, GA 31208
(478) 742-4280 (telephone)
(478) 742-8720 (facsimile)